The **PILLSBURY COMPANY**, Petitioner,

v.

**FEDERAL TRADE COMMISSION**,
Respondent.

No. 18825.

United States Court of Appeals
Fifth Circuit.

Jan. 7, 1966.

E. Barrett Prettyman, Jr., Joseph J. Smith, Jr., Washington, D. C., William J. Powell, Minneapolis, Minn., Philip F. Sherman, Gen. Counsel, Pillsbury Co., Minneapolis, Minn., on the brief, Hogan & Hartson, Washington, D. C., of counsel, for petitioner.

J. B. Truly, Asst. Gen. Counsel, Gerald Harwood, Frederick H. Mayer, Attys., F. T. C., Washington, D. C., James McI. Henderson, Gen. Counsel, for respondent.

Before TUTTLE, Chief Judge, JONES and ANDERSON,* Circuit Judges.

TUTTLE, Chief Judge.

This is a petition by the Pillsbury Company to review and set aside an order of the Federal Trade Commission requiring Pillsbury to divest itself of the assets of Ballard & Ballard Company and of Duff's Baking Mix Division of American Home Products Corporation which the Federal Trade Commission found it had acquired in violation of § 7 of the Clayton Act, as amended, and further requiring Pillsbury to restore the acquired companies to the status of "effective competitors." Alternatively, Pillsbury seeks leave to adduce additional evidence pursuant to § 11(c) of the Clayton Act.

After the adoption by Congress of the Celler-Kefauver Antimerger Act of 1950, § 7 of the Clayton Act reads as follows:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no' corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

The Supreme Court has construed the words "may be substantially to lessen competition" in Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510, in the following language:

" * * * Congress used the words 'may be substantially to lessen competition' to indicate that its concern was with probabilities, not certainties. (Footnote omitted) Statutes existed for dealing with clearcut menaces to competition; no statute was sought for dealing with ephemeral possibilities. Mergers with a probable anticompetitive effect were to be proscribed by this Act."

The Commission found the following facts relating to the alleged violations:

On June 12, 1951, Pillsbury purchased the assets of Ballard & Ballard Company

for around $5,177,000 and began operating Ballard's business as part of its own organization. On March 7, 1952, Pillsbury acquired Duff's assets, including a 5-year-old baking mix plant at Hamilton, Ohio.

Both Pillsbury and Ballard milled, manufactured, and sold a full line of wheat flour products. Specifically, both companies produced "family flour" (sold for home use), "bakery flour" (sold for use by bakeries), "flour-base mixes" (labor-saving preparations such as cake mixes, pancake mixes, etc.), and "formula feed" (for animal consumption). Duff was only in the flour-base mix business, having been one of the pioneers in this field. Although the complaint alleged competitive injury in each of the specific product fields mentioned, the Commission's decision dealt with only three "lines of commerce:" "family flour," "flour-base mixes," and a general category which the Commission found appropriate to include encompassing all of the products of Pillsbury and Ballard which it called "the wheat flour milling products industry." So much for the products involved.

As to the geographic market, both Pillsbury and Duff did business on a nationwide basis; therefore, it was charged that injury to competition in the flour-base mix industry throughout the United States occurred as a result of Pillsbury's acquisition of Duff. Ballard, although its business was more diversified than Duff's, as indicated, substantially restricted its operations to the southeast. The Commission therefore charged that Pillsbury's acquisition of Ballard resulted in unlawful injury to competition in (1) the family flour industry in the southeast and (2) the wheat flour milling products industry in the southeast. Additionally, it charged that Pillsbury's acquisition of both Ballard and Duff resulted in unlawful injury to competition in the flour-base mix industry in the southeast. For purposes of this case, the "southeast" is defined as "that part of the United States generally lying east of the Mississippi River and south of the Ohio and Potomac Rivers."

Because of the disposition we make of this petition no statement need be made of the specific findings of the Commission. These may be found in the published report, 15 FTC 1274. Suffice it to say that the Commission found that the acquisitions violated the Act, since the probable effect would be "substantially to lessen competition" in the described fields of industry. It further ordered divestiture of the acquired businesses.

This appeal raises several questions. The first is: Assuming the Commission's findings of fact are sustained, did Pillsbury violate § 7 of the Clayton Act, as amended, in (a) acquiring Ballard? (b) in acquiring Duff? The second question is whether some of the evidence which the Commissioner relied on, notably the Mintener Letters and the Commission surveys, was either so lacking in reliability or obtained in such a manner, violating procedural due process requirements, as to make it improper for the Commission to have based its conclusions even partially on such testimony. The third question is whether there were other violations of procedural due process of such a nature as to seriously infect the proceedings in such a manner as to require a reversal of the Commission's order. A fourth question is whether assuming none of the foregoing grounds of error require a reversal, should the Court grant Pillsbury's motion to adduce additional evidence? Finally, is the Commission's order of divestiture legal?

Since a resolution of one of the attacks made under the procedural due process heading, if decided favorably to Pillsbury, would make unnecessary our consideration of any of the other matters, we shall deal with that first. It is the alleged improper interference by committees of Congress with the decisional process of the Federal Trade Commission while the Pillsbury case was pending before it. The alleged interference, we hasten to add, was not alleged improper influence behind closed doors but was rather inter-

ference in the nature of questions and statements made by members of two Senate and House subcommittees having responsibility for legislation dealing with antitrust matters, all clearly spread upon the record.

Briefly stated, the criticism of the conduct of the members of the House and Senate arises in this manner: following the filing of the complaint against Pillsbury on June 16, 1952, the Government undertook to make out its case in chief. On April 22, 1953, the hearing examiner granted Pillsbury's motion to dismiss, taking the position that the record lacked figures showing the sales volume of the various Pillsbury products after the challenged acquisitions had taken place and that there were no "authentic or reliable" figures showing the sales and production of competing companies in the industry. On appeal, the Commission reversed by an order dated December 21, 1953. Thereafter, the Pillsbury Company undertook to introduce its evidence, and evidence for both parties continued to be received for the next several years.

During the months of May and June, 1955, hearings were held before the subcommittee on antitrust and monopoly of the Committee of the Judiciary of the United States Senate, and before the antitrust subcommittee of the Committee on Judiciary of the House of Representatives. At these hearings, Mr. Howrey, the then Chairman of the Commission, and several of the members of his staff, appeared including Mr. Kintner, the then General Counsel and later Chairman of the Commission, who wrote the final opinion from which this appeal is prosecuted.

It is to be noted that these hearings were held after the Commission had issued its interlocutory order, but long before the examiner made his Initial Decision on the merits, and, of course,

before the Commission made its final Decision in 1960.

In this interlocutory opinion of the Commission, reversing the dismissal of the Pillsbury case by the examiner, the Commission rejected an argument made by the Government (counsel supporting the complaint) to the effect that where a showing that a company in the field having a substantial share of the business of the industry acquires the assets of competitors so that the resulting merged entity would meet the "substantiality" test of Standard Oil Co. of California v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371, no further proof need be introduced in support of the complaint. This is what will be hereafter spoken of as the "per se" doctrine. The Commission in its order reversing the order of dismissal rejected this contention and expressly held that the per se doctrine did not apply under § 7, as amended.

The posture of the case at the time of Mr. Howrey's appearance before the Senate Committee, therefore, was that the Commission had found sufficient evidence to make a prima facie case of acquisition of competitors by a company having a substantial share of the business in the specified fields of industry, and a prima facie case of other conditions in the industry to make out an affirmative case of a "substantial lessening of competition." The Commission had, thus, given Pillsbury an opportunity to introduce countervailing evidence. Some had already been introduced and the prospects were that this would continue for a considerable period of time.[1]

When Chairman Howrey appeared before the Senate subcommittee on June 1, 1955, he met a barrage of questioning by the members of the committee challenging his view of the requirements of § 7 and the application of the per se doctrine announced by the Supreme Court

---

1. After the presentation of the parties' cases was completed the hearing examiner filed his Initial Decision on February 1, 1959. The Commission's Decision and Order, largely following the examiner's Initial Decision, was entered on December 16, 1960. This appeal followed.

in the Standard Stations case, Standard Oil Co. of California v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949), in a Clayton Act § 3 case, to § 7 proceedings. A number of the members of the committee challenged the correctness of his and the Commission's position in holding that a mere showing of a substantial increase in the share of the market after merger would not be sufficient to satisfy the requirement of § 7 of a showing that "the effect of such acquisition may be substantially to lessen competition."

Much of the questioning critcized by the petitioner here is in the nature of questions and comments by members of the committee in which they forcefully expressed their own opinions that the per se doctrine should apply and that it was the intent of Congress that it should apply.

The thrust of the comments and questions was that there was no need to carry on the long and complicated inquiry into all of the surrounding matters reflecting on the conditions in the industry if the Commission should determine that there was a substantial acquisition by a substantial number of the industry; that monopolies ought to be stopped quickly, and that Congress did not intend the Commission to apply the "rule of reason" in § 7 proceedings.

The questions were so probing that Mr. Howrey, the chairman of the Commission, announced to chairman Kefauver of the subcommittee that he would have to disqualify himself from further participation in the Pillsbury case (see quotations below).

Unfortunately, substantial portions of the questions and answers must be quoted in order that our opinion can be understood. The persons present and the positions they occupied at the time of the hearing, and their participation in the Commission's final Order are here outlined:

On Wednesday, June 1, 1955, FTC chairman Edward F. Howrey appeared before the Senate subcommittee on Antitrust and Monopoly. This was, as already stated, after the remand of the Pillsbury proceedings to the hearing examiner by the Commission in 1953, and the Pillsbury matter was still pending before the hearing examiner at the time of this Senate hearing. In the afternoon session, chairman Howrey was accompanied by Robert P. Secrest, Earl W. Kintner, and Joseph E. Sheehy. Mr. Secrest was a Commissioner both at the time of the hearings in question and at the time of the Commission's final Pillsbury decision in 1960; Mr. Kintner was, at the time of the 1955 hearings, General Counsel to the Commission, and at the time of the Commission's final Pillsbury decision, he was chairman of the Commission (and, in fact, wrote the final Pillsbury decision itself); Mr. Sheehy was Director of the Bureau of Litigation at the time of the hearings and his then assistant, Mr. William C. Kern, was a Commissioner at the time of the final Pillsbury decision. Of the remaining two Commissioners in 1960, one, Commissioner Mills, did not participate in the final Pillsbury decision, since he had not heard the oral argument therein, and the other Sigurd Anderson, had no apparent connection with the 1955 hearings. Thus, of the four commissioners who actually participated in the final 1960 Pillsbury decision, two (Commissioners Secrest and Kintner) were substantially exposed to whatever "interference" was embodied in the hearings and one (Commissioner Kern) was at least indirectly "affected", by reason of his FTC status in 1955 as Secrest's assistant.

The following quotations of questions and answers are taken from Hearings Before the Subcommittee on Antitrust and Monopoly of the Committee on the Judiciary, United States Senate, Eighty-Fourth Congress (First Session) Part I. [p. 84]

[Chairman Kilgore]: "On the problem of mergers Congress enacted the Celler-Kefauver Antimerger Act of 1950 primarily for the purpose of plugging a loop-hole in section 7 of the

Clayton Act in order to slow down the merger movement and stop those which might substantially lessen competition. We wish to learn why mergers have continued at a great pace. Is it because section 7 is still not adequate to prohibit undesirable mergers? Is it because the law has not been vigorously enforced? Or can it be said that most of the mergers do not substantially lessen competition and should not be prohibited? This subcommittee hopes to throw light on this perplexing problem through testimony at these and succeeding days' hearings."

\* \* \* \* \* \*

[p. 125]

[Chairman Kilgore]: "In the legislative history of the Act and in the Attorney General's Committee report, it is emphasized that the tendency to monopoly provision would reach even a relatively minor acquisition in the light of a historical pattern of acquisition. What has the Commission done to combat this type of acquisition since the enactment of the law?

[Mr. Howrey]: "Well, I think I agree with that wholeheartedly, that is, where there has been a pattern of minor acquisitions, and that is exactly what occurred in our Pillsbury case, where they had acquired a couple of small mills in Iowa and other mills in various parts of the country and there was a historical pattern of acquisitions of small companies.

And so, we agree, we follow that policy and work on it in our examination."

\* \* \* \* \* \*

[p. 126]

[Mr. Howrey]: "That is, if it [Standard Stations case] held, just as International Salt did under section 3, that just dollar volume was enough why, clearly, we did not—we rejected that in Pillsbury.

Now, if that held that quantitative substantiality meant share of the market, why, we rejected that in the Pillsbury case, standing alone. I mean, we

rejected that theory as being applicable to all cases."

\* \* \* \* \* \*

[p. 128]

[Chairman Kilgore]: "Now, under the Pillsbury case, I think you pointed out that this company by acquiring two competitors, the second largest miller in the country, increased its share of the mix market in the Southeast from approximately 20 to 23 percent to 45 percent, which also put it in first place nationally in the mix field, its share increasing from 16 percent to 23 percent.

Shouldn't those figures have been practically sufficient to determine the issue of substantial lessening of competition or tendency to monopoly in the Southeast markets?

[Mr. Howrey]: "That is something that is a hard question for me to answer. The other facts are in the record.

I think that the share of the market, where it is of sufficient size, may in many cases be enough, standing by itself.

On the other hand, I can think in some instances where the share of the market might be insufficient, where there is plenty of remaining competition, and where there may have been other reasons for the merger, such as bad financial condition or something, which might involve a substantial share but still might not affect competition.

I think the goal in each case to determine whether the competitive pattern in the market has been involved and the percentage share of the market may in some cases be enough to show that and in other cases may not.

I hate to fix on any one percentage, because Judge Hand did that in the ALCOA case and has never been able to live it down.

[The Chairman]: "Yes.

Now, has the Commission found that the Department of Justice does not deem it necessary to consider all the factors relied upon by the Commission

in its Pillsbury decision in deciding the legality of certain horizontal acquisions.

[Mr. Howrey]: "I don't know, of course, what the Department of Justice thinks."

*   *   *   *   *   *

[p. 137]

[Senator Kefauver]: "Then, Mr. Howrey, on the statement you made this morning, and as set forth in your opinion here, generally, insofar as dough mix or whatever it may be, in the southeastern part of the United States, Pillsbury had approximately 22 or 23 percent, and Duff and Ballard had 22 or 23 percent, and so somewhere they were winding up with between 45 and 48 percent of the dough-mix business in the southeastern part of the country. Those are rough figures, but that is substantially correct, is it not?

[Mr. Howrey]: "Yes, that is substantially correct.

I can give you the precise figures.

[Senator Kefauver]: "Well, they are in your opinion here. But that would be quite an obvious lessening of competition, particularly in view of the fact that there have been so many acquisitions prior to that time in the flour business. Wouldn't you have thought so?

[Mr. Howrey]: "Yes, and I so said and so held."

[At this point, it should be noted that members of the Committee spoke as if the basic facts as to substantiality of shares in the market had already been determined. Actually, these facts were still being litigated before the Commission. The Commission's order which Howrey was being questioned about held merely that a prima facie case as to substantiality had been made out by the Government. Pillsbury had not yet had its turn at bat].

*   *   *   *   *   *

[pp. 138–141]

[Senator Kefauver]: "It would seem to me that in a case where it is quite obvious and plain that there is a lessening of competition and, therefore, a violation of section 7 of the law, that perhaps the companies themselves would be relieved of future headaches if, upon their refusal to hold off until after the litigation can be settled, the Department of Justice were asked to institute injunction proceedings.

[Mr. Howrey]: "I want to say, if I may, that the opinion we rendered was after the close of the Government's case, and we said in the opinion, and I should say in my testimony, because I am a quasi-judicial officer, and if anybody reads it, they will see that I made up my mind, and will ask that I disqualify myself and, I think, rightly so—I should qualify what I said before, that we so held that the history of acquisitions and the relative share, and so forth, when I characterized that, I meant to characterize that solely what they made was what we think is a prima facie case and, of course, Pillsbury has an opportunity to come back and is putting in its case right now so that the case has not been decided and I should not indicate that it has.

[Senator Kefauver]: "Mr. Howrey, that is another thing that worries me about this decision. I do not see how you can hardly ever get to an end of litigation if the decision of the Federal Trade Commission is merely that [a] prima facie case violation has been found, and then it goes eventually to the courts, where there is still more argument.

Did not Pillsbury already submit information at the time this decision was rendered?

[Mr. Howrey]: "Yes; but under long established procedures and more particularly under the Administrative Procedure Act, every person, every corporation, has his right to his day in court, and we have to decide these things on sworn testimony made upon the public record and under the procedures established by Congress.

So whatever delay occurs in that respect, I think is due to the type of ju-

risprudence under which this country lives.

But I should, if I may, just add to that, the record in the Pillsbury case at the close of the Government's case was not a big record. It was 3,500 pages.

Now, in an antimonopoly or antitrust case, unfortunately or fortunately that is considered a small record.

[Senator Kefauver]: "Well, I appreciate the fact that there must be some consideration given to 'size and the effect upon competition, and you must have some standards to go by. But is not this Pillsbury case a pretty good example of what your rule of reason is going to get you into?

[Mr. Howrey]: "Yes; I think it is a very good example of it, and, of course, I conclude differently from you. I think it proves 100 percent that you can apply the rule of reason approach and have a relatively small record and relatively quick trial because, as I say, the case in chief was put in in 3,500 pages.

Now, the old Cement case went to 30,000 pages.

[Senator Kefauver]: "But, Mr. Howrey, it has just started. The thing has been going on ever since December 1953, and the hearing examiner is still hearing all this, that and the other, under your rule of reason. When does this terminate?

[Mr. Howrey]: "Well, Pillsbury is putting in its case now, and I do not know just when they will finish. But you cannot try merger cases like you can try a personal injury case or a contract case or a promissory-note case.

All of the restraint-of-trade cases that we have on our books are long cases. I would say that the Pillsbury record is shorter than almost any other."

\* \* \* \* \* \*

[Senator Kefauver]: "This illustrates what I have been talking about, Mr. Howrey. I think Congress expected that where there was manifestly a lessening of competition, under the amended Clayton Act a merger should not take place.

Now, here in the Southeast, a section of the country, there is a lessening of competition because one firm had 20 and something percent and the other had 20 and something percent.

It would seem to me by applying the rule of reason and running the record up to 9,000 pages with more to come, and bringing in every possible economic factor, this, that, and the other, that the Federal Trade Commission is rather taking over the prerogative of congressional intent.

[Mr. Howrey]: "I would not think so, Senator. I think a careful study of the legislative history of amended section 7 requires the law-enforcement agency, and the quasi-judicial agency, to examine the market facts. I think the fact is that you did away with the test originally which was whether there was a lessening of competition between the acquiring and the acquired company. You did away with that test. We have to show that there is a lessening or maybe there is a probability of a lessening of competition in a segment of the market involved.

Now, the question is how are you going to show that. There is no one factor that I think conclusively demonstrates that. In one case you might have a very large share of the market involved and that might be enough.

In another case you might have a fairly substantial share of market involved, and that may not be enough.

There might be new entries into the business; there might be strengthening of competition.

If you are taking one factor—supposing you had taken the Kaiser-Willys, if I may—

[Senator Kefauver]: "Let us stay with Pillsbury, Mr. Howrey.

It was not the intention of Congress where there is obviously a combination which lessens competition in an area to have the Federal Trade Commission

supplant the intent of Congress and decide whether Congress really meant to apply the law to this case, or Congress did not mean to apply it. And did not you, as a matter of fact, overrule your counsel and your staff in applying the rule of reason in the Pillsbury case?

[Mr. Howrey]: "Well, we frequently overrule our counsel and our staff, that is what we are for. We are a quasi-judicial agency. If we were going to agree with our staff on every issue why, we would not, we should not, exist.

[Senator Kefauver]: "I am not arguing about your right to overrule it, but I am just asking if you did overrule them.

[Mr. Howrey]: "Well, I can answer that more specifically. The brief of Counsel in support of the complaint took two positions: It took the position first, that the Standard Stations doctrine, which is sometimes called the quantitative substantiality doctrine— that means different things to different people; to some people it means the dollar volume involved, and to other people it means the share of the market involved—they said, citing the International Salt case, which was a section 3 case, it was the dollar volume; in Standard Stations they said some people say it is the share of the market.

They said under those two cases 'We feel we have made a prima facie case by showing those facts.'

They said, 'In addition we have shown all these other facts so that if that doctrine does not apply, we have shown that there are no new entries; that there is a pattern of acquisitions both by Pillsbury and by the industry as a whole; that there have been decreasing numbers of mills,' and so forth. So they took both positions.

They took the alternative positions in their brief. We agreed with the latter provision. We did say that we did not think section 3—what the courts had said about section 3—ap-

plied in section 7 cases for the reason I set forth this morning, and that is the record of Pillsbury, I do not think, would have constituted a violation of the Sherman Act.

[Senator Kefauver]: "You are aware, are you not, Mr. Howrey, that in the Consolidated Steel case, as a result of mergers, Consolidated held about 28 percent of the business in 1 section of the country. The Supreme Court held that was not a violation of the Sherman Act, but by a 4-to-3 decision. So 28 percent was getting mighty close to the point of violating the Sherman Act, in the opinion of the Supreme Court.

Yet you think 48 percent apparently would not?

[Mr. Howrey]: "Senator, I must not answer your characterization because I did not say that at all. I say the Consolidated Steel case was a typical case where it was not a Sherman Act violation but it would have been a section 7 violation and that, I think, is the situation in Pillsbury; that is the difference.

[Senator Kefauver]: "I just want to say, as one who has been very much interested in this, Mr. Howrey—and we are just talking in the sense of being the best of friends here, because I think we all have, I hope we all have, the same interests—that I have been rather shocked and surprised with the turn that has been given to the amendment to the Clayton Act, having lived with it since the early 1940's.

I became interested in this amendment way back when Judge Davis was Chairman of the Federal Trade Commission and Congressman Gwynne was a member of the House Judiciary Committee. It was never the intention of the Judiciary Committee of the House —and I am certain that the same was true over here—that the new amendment to section 7 of the Clayton Act should be enforced, as you have enforced it, on the basis of Sherman Act tests. It was intended that it what the Congress had said about

was to be enforced on the basis of section 3 and the other sections of the Clayton Act.

Here, I cannot be sure, but it seems that you are applying no different treatment to section 7 of the Clayton Act than has always been applied to Sherman Act cases. That was just not the intent of many of us who were interested in this legislation.

[Mr. Howrey]: "I probably cannot convince you, but I would like to respond to your last statement: First I have just said that the Consolidated Steel case and Pillsbury case were two cases where the Sherman Act did not stop the mergers, but where section 7 will. Now, there is one difference.

Now then, I do not know whether I should speak for Judge Gwynne, but he was on the Judiciary Committee and he wrote the report in the 80th Congress on this section and he joined in the Pillsbury opinion.

[Senator Kefauver]: "Maybe he made a mistake.

[Mr. Howrey]: "Well, maybe he did. I do not think he did. I think he is a very able lawyer.

[Senator Kefauver]: "I agree with you he is an able lawyer, and I was surprised when I saw his approval of the Pillsbury case.

[Mr. Howrey]: "Secondly, the Attorney General's committee approved the Pillsbury approach, with very few dissents. There were just a handful of dissents, and the committee represented, I think, a good cross section of legal and economic thinking of the country.

[Senator Kefauver]: "Well, Mr. Howrey, I disagree with you very strongly. I do not think the Attorney General's committee represented a cross section. Although it had some members who represent the public interest, I think it largely was loaded in favor of big business.

[Mr. Howrey]: "Well, I disagree with that one, Senator.

[Senator Kefauver]: "I also think that you, as chairman of a quasi-judi-cial body, have done some damage to your judicial position in joining in a report so that everybody can see just exactly how you feel about matters not before your Commission.

[Mr. Howrey]: "I would like to answer that, if I may.

There is a note at page 5 of the report that while I participated in the proceedings, and, as a matter of fact, I have a little written statement on that I would like to insert in the record, if I may.

[Senator Kefauver]: "Without objection it will be inserted.

What I am getting at is—

[Mr. Howrey]: "I know what you are getting at, and I have an answer to it.

[Senator Kefauver]: "Any lawyer can take this report and know exactly how Mr. Howrey's thinking goes about any antitrust problem that is discussed in it, and they are all discussed.

[Mr. Howrey]: "Well, I think the question you are asking about the Pillsbury decision is a much greater challenge to judicial processes, because I am sitting as a quasi-judicial officer in that case. That is a much greater challenge to judicial processes than anything I did by participating in this committee of the Attorney General.

[Senator Kefauver]: "Maybe you should not have answered my questions.

[Mr. Howrey]: "I think I will disqualify myself in the Pillsbury case for the rest of the case because of the inquiry which you have made about my mental processes in it.

But let me answer your other question, and I think I should because I do not think I can sit in a quasi-judicial capacity and—I think you have delved too deeply into the quasi-judicial mind in the Pillsbury matter.

But as a member of the Attorney General's committee, I attended its two general sessions. I was not a member of any task force or work group, and

I did not attend any session of any such group.

I did not vote on specific issues nor did I participate in the discussion of any matter in which I had an interest before becoming a member of the Federal Trade Commission such as, for example, the quantity limit proviso. In fact, I was not in the conference room when the quantity limit proviso was discussed.

In addition, I call your attention to the following statement set forth on page 5 of the report:

> While the Chairman of the Federal Trade Commission participated in the proceedings of the committee and signed the report, this should not be construed as a prejudgment of issues which may come before the Commission in individual cases.

Now, that seems to me to be an answer to the criticism that I participated in it.

The administrative agency is, as you know, a conglomerate. We are administrators one day; we are quasi-judicial officers the next.

We decide what complaints should issue; we vote on that, and then we sit and hear the evidence; that is the administrative procedure, that is administrative law, and it has grown up and has become one of the great branches of our Government.

So I do not see how, as an administrator, I could do anything else but participate in a study of the very subject which I was administering.

When the Attorney General invited me to participate, I, of course, accepted."

    &ast;    &ast;    &ast;    &ast;    &ast;    &ast;

[p. 179]

[Mr. Sheehy]: "Senator, I cannot control what the respondent will do. I can merely tell you we will put our case in in a period of about 6 weeks after we get them into the field. We put our Pillsbury case in in a period of 4 months, and the respondent has now finished approximately 1 year putting its case in, and we cannot control that. We can merely attempt to meet it as it comes in.

[Senator Kefauver]: "You mean the Commission has no control over how long a respondent has to put in his case?

[Mr. Sheehy]: "No, sir; the Bureau of Litigation has no control. I am speaking solely for it.

[Senator Kefauver]: "Doesn't the Commission have some control over it?

[Mr. Howrey]: "The hearing examiner has complete charge of the case under the statute.

[Senator Kefauver]: "You mean you have no right as a Commissioner to say speed up this case and give them 3 months to get it completed?

[Mr. Howrey]: "No; we have no such right. Under the Administrative Procedure Act, the hearing examiner, as I say, has charge of the case, and we can hear it on interlocutory appeals, and we have, of course—

[Senator Kefauver]: "It certainly seems to me that if monopoly is a bad thing, there ought to be some way of speeding up consideration of these cases so that the public and competitors won't be imposed on all this length of time where, while they are taking all the time they want, and more, probably, getting their defenses in. Then, after the Commission decides, then they have recourse to the courts. In the meantime, they have been maybe enjoying all of the benefits of monopoly. Is that correct?"

The foregoing quotations are not nearly all the references to the Pillsbury case in the course of the Committee hearings. This case or the Pillsbury name was referred to more than 100 times during the several hearings. We have here quoted only from a morning and afternoon session before the Senate subcommittee.[2]

2. In addition to the pointed references to the Pillsbury litigation which were made at the hearings, the reports which emanated from each of the hearings contained

We think it is not necessary to consider the contention of petitioner here that the House hearings, conducted a little earlier, were also damaging to Pillsbury and were of such a nature as to deprive it of procedural due process. We conclude that the proceedings just outlined constituted an improper intrusion into the adjudicatory processes of the Commission and were of such a damaging character as to have required at least some of the members in addition to the chairman to disqualify themselves. We think it illuminating to quote Chairman Howrey's statement relative to his decision to disqualify himself, which he read into the record at the House subcommittee hearing. He said:

" * * * I wrote the opinion [in the Pillsbury case]. It is still a pending adjudication; and because of some of the penetrating questions over on the Senate side, I felt compelled to withdraw from the case because I did not think I could be judicial any more when I had been such an advocate of its views in answering questions."

In view of the inordinate lapse of time in this proceeding, brought to undo what was done by mergers completed in 1951, we are naturally loathe to frustrate the proceedings at this late date. However, common justice to a litigant requires that we invalidate the order entered by a quasi-judicial tribunal that was importuned by members of the United States Senate, however innocent they intended their conduct to be, to arrive at the ultimate conclusion which they did reach.

As early as 1776 it was clear that ours was destined to be a government of laws and not of men. In their complaint against the abuses of the British crown, the framers of the Declaration of Independence included the statement that: "He has made Judges dependent on his Will alone, for the tenure of their offices, and the amount and payment of their salaries." Although our Founding Fathers attempted to lay this question to rest on the federal level through Article III, Section 1 of the United States Constitution,[3] the emergence of administrative tribunals as the "fourth branch" of our federal government has revived the problem. Consequently, the federal judicial function, to the extent that it is exercised by administrative bodies, has not been able to make a clean break with the implicit influence inherent in Congressional control over tenure and salary.

But, as we all know, the problem is not as simple as this, since the arsenal of tools with which an administrative agency implements its broad statutory mandates also includes legislative rule-making power. It is this latter power which sets regulatory agencies apart from courts of law and results in their functions being labelled "quasi-judicial" and "quasi-legislative."

We are sensible of the fact that, pursuant to its quasi-legislative function, it frequently becomes necessary for a commission to set forth policy statements or interpretative rules (to be distinguished from strict "legislative" rules, see generally 1 Davis, Administrative Law §§ 5.03–04 (1958)) in order to inform interested parties of its official position on various matters. This is as it should be.

At times similar statements of official position are elicited in Congressional hearings. In this context, the agencies are sometimes called to task for failing to adhere to the "intent of Congress" in supplying meaning to the often broad statutory standards from which the agencies derive their authority, e. g., "sub-

further remarks directed to that case which were in much the same vein as the hearings. The reports were generally highly critical of the Commission's performance in enforcing the Celler-Kefauver Anti Merger Act. They also were replete with references which dealt directly with the Pillsbury matter. See Interim Report

the Antitrust Subcommittee (No. 5), House Judiciary Committee, 84th Cong., 1st Sess. (1955); S.Rep. No. 132, 85th Cong., 1st Sess. (1957).

3. The same problem has always existed, of course, with regard to non-Article III courts.

stantially to lessen competition" or "to tend to create a monopoly." There are those who "take a rather dim view of [such] committee pronouncements as to what agency policy should be, save when this is incident to proposals for amendatory legislation." Friendly, The Federal Administrative Agencies 169 (Harvard University Press 1962). Although such investigatory methods raise serious policy questions as to the *de facto* "independence" of the federal regulatory agencies, it seems doubtful that they raise any constitutional issues. However, when such an investigation focuses directly and substantially upon the mental decisional processes of a Commission *in a case which is pending before it,* Congress is no longer intervening in the agency's *legislative* function, but rather, in its *judicial* function. At this latter point, we become concerned with the right of private litigants to a fair trial and, equally important, with their right to the appearance of impartiality, which cannot be maintained unless those who exercise the judicial function are free from powerful external influences. See In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955); United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 267–268, 74 S.Ct. 499, 98 L.Ed. 681 (1954). "A first principle of Anglo-American jurisprudence, * * * basic to the conception of due process in the procedural sense" is "that the ends do not justify the means." Douglas, We The Judges 354 (Doubleday 1956).[4]

To subject an administrator to a searching examination as to how and why he reached his decision in a case still pending before him, and to criticize him for reaching the "wrong" decision, as the Senate subcommittee did in this case,[5] sacrifices the appearance of impartiality —the *sine qua non* of American *judicial* justice—in favor of some short-run notions regarding the Congressional intent underlying an amendment to a statute, unfettered administration of which was committed by Congress to the Federal Trade Commission (See 15 U.S.C.A. § 21).

It may be argued that such officials as members of the Federal Trade Commission are sufficiently aware of the realities of governmental, not to say "political," life as to be able to withstand such questioning as we have outlined here. However, this court is not so "sophisticated" that it can shrug off such a procedural due process claim merely because the officials involved should be able to discount what is said and to disregard the force of the intrusion into the adjudicatory process. We conclude that we can preserve the rights of the litigants in a case such as this without having any adverse effect upon the legitimate exercise of the investigative power of Congress. What we do is to preserve the integrity of the judicial aspect of the administrative process. See United States v. Morgan, 313 U.S. 409, 422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941).

4. An excellent discussion of the dual nature of the administrative agency may be found in the Report on Congressional Oversight of Administrative Agencies of the Committee on Administrative Law of the Association of the Bar of the City of New York 5 Record ABNYC 11 (1950) which at p. 14 includes the following paragraph: "We take it to be established principle that the legislature's task is confined to (1) establishing policy standards, (2) prescribing the structure and procedure of the agency, and (3) appropriating the necessary funds. It then becomes the agency's responsibility to administer the statute within the policy standards set forth by the legislature, through the methods of procedure established by the legislature, with such funds as the legislature has allotted. In this administering the act, the agency is to be free of legislative interference. Thus we find that legislative oversight of the agency should be essentially directed to the need for altering standards, structure and procedure, or budget through legislation."

5. Note Senator Kefauver's statement. supra: "I have been rather shocked and surprised with the turn that has been given to the amendment to the Clayton Act, having lived with it since the early 1940's."

We are fully aware of the reluctance expressed by the Supreme Court to disqualify the members of the Federal Trade Commission for bias or prejudice (a somewhat different basis than that urged here) in Federal Trade Commission v. Cement Institute, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010. There the Court seems to have placed its decision largely on the grounds of necessity. The Court said, "[T]his complaint could not have been acted upon by the Commission or by any other government agency," since "Congress has provided for no such contingency. [as disqualification] It has not directed that the Commission disqualify itself under any circumstances * * *." The quoted language would be equally applicable here if the alternative to affirming the order were a judgment prohibiting consideration and decision by the Commission for all time. Such is not the case.

Bearing in mind the generally accepted principle enunciated by the Supreme Court in United States v. Morgan that the questioning of a judge as to his judicial processes "would be destructive of judicial responsibility," 313 U.S. 409, 422, 61 S.Ct. 999, 1004, we seek to find a solution that guarantees a fair tribunal and that does not frustrate the purposes of the law.

Although we conclude that the course of the questioning before the Senate subcommittee in June 1955 deprived the petitioner of the kind of hearing contemplated by the Supreme Court in its opinion in Offutt v. United States, (1956) 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11, we are convinced that the Commission is not permanently disqualified to decide this case. We are convinced that the passage of time, coupled with the changes in personnel on the Commission, sufficiently insulate the present members from any outward effect from what occurred in 1955.

It is extremely unfortunate that this complaint, seeking divestiture by Pillsbury of two other companies acquired by it, has taken this long to reach the present stage of the litigation. It com-menced as a pioneer case under the new amendment to the law. However, in the meantime much law has been written as to the quantity and quality of proof needed under a Section 7 complaint while it has been pending. See Brown Shoe Co. v. United States, 1962, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510; United States v. Philadelphia National Bank, 1963, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915; United States v. El Paso Natural Gas Co., 1964, 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12; United States v. Aluminum Company of America, 1964, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314; and United States v. Continental Can Co., 1964, 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed.2d 953.

We conclude that the order appealed from must be vacated and the case remanded to the Commission. The Commission as now constituted can then determine what steps should then appropriately be taken in view of both the lapse of time and the present state of the case law applying Section 7.

The Order is vacated and the case is remanded to the Commission.