**PETER KIEWIT SONS' CO.**

v.

**U.S. ARMY CORPS OF ENGINEERS,
et al., Appellants.**

No. 82–1461.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 18, 1983.
Decided Aug. 9, 1983.

**164**

Judith Bartnoff, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellants.

W. Stanfield Johnson, Washington, D.C., with whom Eldon H. Crowell and Warren J. DeVecchio, Washington, D.C., were on the brief, for appellee.

Michael Davidson, Senate Legal Counsel, M. Elizabeth Culbreth, Deputy Senate Legal Counsel, and Morgan J. Frankel, Asst. Senate Legal Counsel, Washington, D.C., were on the brief, for amicus curiae, urging reversal.

Before MIKVA and EDWARDS, Circuit Judges, and BAZELON, Senior Circuit Judge.

Opinion for the Court filed by Senior Circuit Judge BAZELON.

BAZELON, Senior Circuit Judge:

The Army[1] appeals from the district court's action (1) enjoining completion of its administrative debarment proceeding against appellee, and (2) ordering that appellee not be debarred.[2] The court rested its action on a finding that improper congressional interference had voided the administrative proceeding ab initio. We find that the court erred in voiding the debarment proceeding and deciding the substantive issue underlying that proceeding.

### I. BACKGROUND

Appellee Peter Kiewit Sons' Co. (Kiewit) is the largest subsidiary of Peter Kiewit Sons', Inc. (Kiewit, Inc.), a large construction company performing much of its work under contracts with the United States Government.[3] In 1978, Kiewit was indicted with fifteen other firms for conspiring to rig bids on Corps contracts for riverbank stabilization work along the Missouri and Mississippi Rivers. Kiewit was convicted of a Sherman Act violation following a plea of

---

1. There are three appellants in the instant case: the Army Corps of Engineers (Corps), the Department of the Army (Army), and the Department of Defense. They will be referred to collectively as "the Army."

2. This case arises from a decision by the Corps to withhold a contract from appellee Peter Kiewit Sons' Co. pending completion of the Army's debarment proceedings. The district

court found this abeyance illegal and awarded the contract to Kiewit. This award is not challenged on appeal.

3. From 1970 to 1981, for example, Kiewit was the successful bidder on over $1.3 billion in government contracts. *See Peter Keiwit Sons' Co. v. U.S. Army Corps of Eng'rs*, 534 F.Supp. 1139, 1141 (D.D.C.1982).

nolo contendere.[4]  *United States v. Anthony J. Bertucci Construction Co., et al.,* Cr. No. 78–332 (E.D.La.).

After the 1978 indictments, the Corps continued to contract with Kiewit and the other indicted firms.[5]  In June, 1981, when the Corps learned that the last of the *Bertucci* defendants had been sentenced, the Corps Chief Counsel decided to recommend debarment of individual defendants to the Assistant Judge Advocate General for Civil Law, the only official empowered to order debarments.[6]

Reluctant to continue contracting with firms that it was about to recommend debarring, the Corps, on August 19, 1981, issued instructions to hold in abeyance any contracts on which a *Bertucci* defendant was low bidder.[7]  Kiewit was not given notice of this action.  The district court held, and it is not challenged on appeal, that the August 19, 1981 directive was an illegal de facto debarment of Kiewit.

A.  *The Barbers Point Contract*

On August 27, 1981, the Corps opened bids on the construction of a harbor at Barbers Point, Hawaii.  Kiewit was low bidder.  The August 19, 1981 directive, however, prevented award of the contract.[8]

But for this directive, Kiewit would have been found presently responsible[9] and therefore awarded the contract.

On December 10, 1981, Brigadier General Ronald Holdaway, the Assistant Judge Advocate General for Civil Law, initiated formal debarment proceedings by issuing notices of proposed debarment to each of the *Bertucci* contractors, including Kiewit.  The notice informed Kiewit (1) that debarment was being considered, (2) that the proposed debarment was based on the Sherman Act conviction, (3) that the conviction was a ground for debarment under DAR 1–604.-1(i),[10] and (4) that Kiewit had the opportunity to "present information in opposition . . . in person, in writing or through representation" within thirty days.[11]

On December 17, 1981, the contracting officer determined that the Barbers Point contract could no longer be held in abeyance.  Award of the contract to the second lowest bidder was scheduled for December 30, 1981.  On December 29, Kiewit filed the instant action.

In its complaint Kiewit alleged that unwarranted congressional criticism had resulted in an abdication of agency discretion by the Corps regarding award of the Bar-

---

4.  The plea was entered in April, 1981.  Kiewit also paid a $100,000 criminal fine and $300,000 in civil penalties.  Kiewit paid the civil penalties in June, 1981.

5.  534 F.Supp. at 1144 (Finding of Fact 20).  This action was taken in part because the Judge Advocate General's office believed that administrative action prior to the conclusion of the criminal proceedings might interfere with those proceedings and result in unequal treatment of the criminal defendants.

6.  Under applicable Defense Acquisition Regulations (DAR), the "Secretary of each Department or his authorized representative . . . is authorized to debar in the public interest."  DAR § 1–604.  The authorized representative of the Secretary of the Army is the Assistant Judge Advocate General for Civil Law.  DAR § 1–600(b)(i), Army Defense Acquisition Regulation (ADAR) 1–601.1.

7.  Contract awards could still be made under limited circumstances on a case-by-case basis.  Joint Appendix (J.A.) 363.

8.  The contracting officer on the project recommended strongly that Kiewit receive the award

despite the abeyance order.  *See* 534 F.Supp. at 1142–43.

9.  Every prospective contractor must make an affirmative demonstration that he is presently responsible, *i.e.,* he fulfills financial, production and ethical requirements.  DAR 1–902, 1–903.

10.  DAR 1–604.1(i) lists as a cause for debarment:

(1) conviction by or a judgment obtained in a court of competent jurisdiction for—

\*     \*     \*     \*     \*     \*

(B) violation of the Federal antitrust statutes arising out of submission of bids or proposals to the Government;

The statute also provides that the "foregoing does not necessarily require that a firm or individual be debarred.  The decision to debar is discretionary; the seriousness of the offense and all mitigating factors should be considered in making the decision to debar."  *See* Joint Stipulation of Facts ¶ 7, J.A. 89.

11.  J.A. 389.  *See* DAR 1–604.3.

bers Point contract. The complaint sought a declaratory judgment and an injunction restraining the Army and the Corps from denying Kiewit the Barbers Point contract, pending a hearing on Kiewit's present responsibility as a government contractor. The complaint challenged only the Barbers Point award, not the pending debarment proceedings initiated by the December 10, 1981 notice.

B. *The Allegations of Congressional Interference*

Throughout this period, the issue of debarment of government contractors, and of the *Bertucci* defendants in particular, had been a subject of interest to Senator Carl Levin of Michigan.[12] At an Armed Services Committee hearing on July 28, 1981, the Senator questioned Deputy Secretary of Defense Carlucci about whether and why the Corps had continued doing business with the *Bertucci* defendants. Senator Levin followed up his questioning of the Deputy Secretary with a letter on July 31, to Secretary of Defense Caspar Weinberger, in which he asked for information on a variety of matters related to the debarment and suspension process, the status of any proceedings involving the *Bertucci* defendants, and contracts that had been awarded to the riverbank stabilization contractors.[13] Secretary of the Army Marsh responded to Senator Levin's letter on September 23, 1981.

Senator Levin learned of the debarment proceedings against Kiewit and wrote to Secretary Marsh and to Deputy Secretary Carlucci on January 12, 1982 inquiring about the status of those proceedings. The Senator noted that he understood that settlement negotiations were going on with Kiewit that might involve a geographically limited debarment, and inquired whether Kiewit's participation on Corps projects in other areas of the country would "jeopardize the integrity of the procurement process and run contrary to the Government's interest." [14]

On January 25, 1982, Senator Levin was given an information paper in response to his inquiries of January 12, and attended a meeting with a number of top Army officials.[15] Brigadier General Holdaway was not present.

C. *The District Court and Administrative Proceedings*

On December 30, 1981, the district court issued a temporary restraining order against award of the Barbers Point contract, pending a hearing on Kiewit's motion for a preliminary injunction. The court also instructed the Army to expedite the debarment proceedings, ordering them "to meet with, receive evidence from, and negotiate with Plaintiff a resolution of the proposed debarment." [16] An administrative hearing was held on January 5, 1982 and settlement discussions took place.

While negotiations were proceeding in January, the government learned that two other Kiewit, Inc. subsidiaries had been con-

---

12. Senator Levin, ranking minority member of the Subcommittee on Oversight of Government Management of the Senate Governmental Affairs Committee, was the co-sponsor of legislation (now 10 U.S.C. § 2393) that requires the Army to debar contractors who have been debarred by other government agencies, absent national security concerns. In addition, Senator Levin, while chairman of the Subcommittee on Government Oversight, had begun a general inquiry into federal debarment procedures. *See Government-Wide Debarment and Suspension Procedures: Hearings Before the Subcommittee on Oversight of Government Management of the Senate Committee on Governmental Affairs*, 97th Cong., 1st Sess. (1981). In April, 1981, the committee transmitted findings and recommendations to an interagency task force that was drafting new debarment and suspension regulations. *See Senate Committee on Governmental Affairs, Subcommittee on Oversight of Government Management*, 97th Cong., 1st Sess., *Reform of Government-Wide Debarment and Suspension Procedures* (Comm. Print 1981).

13. J.A. 423–24.

14. J.A. 433.

15. The meeting was attended by the Senator, William Gianelli, Assistant Secretary of the Army for Civil Works, Lester Edelman, Chief Counsel of the Corps, and Hugh Overholt, an Assistant Judge Advocate General.

16. J.A. 71.

victed of bid rigging and mail fraud.[17] Negotiations to settle the debarment proceedings were terminated. On February 8, 1982, the Army initiated debarment proceedings against Kiewit, Inc. as well for the bid rigging activities of Kiewit and the other Kiewit, Inc. subsidiaries.

The district court held a hearing on the merits at which the correspondence and meeting between Senator Levin and Department of Defense officials were disclosed for the first time. Claiming that these ex parte communications disclosed at trial had compromised the integrity of the administrative proceeding, Kiewit sought to void the proceeding and have the court determine the issue of responsibility underlying the debarment proceeding.

On February 26, 1982, the district court rendered its judgment, deciding (1) that the August 19, 1981 directive had been an illegal de facto debarment and was arbitrary and capricious, (2) that the Barbers Point contract should be awarded to Kiewit,[18] (3) that congressional interference so tainted the debarment proceeding that it was void ab initio, (4) that the court rather than the administrative adjudicator should determine whether Kiewit should be debarred, (5) that Kiewit and Kiewit, Inc. were presently responsible, and (6) that Kiewit and Kiewit, Inc. were not to be debarred.

17. On November 3, 1981, Prairie States Construction Co. was convicted of a Sherman Act violation and mail fraud on a federally funded road-paving contract. On January 14, 1982, Missouri Valley Construction Co., another subsidiary, pleaded guilty to bid rigging on two state highway contracts. J.A. 93–94.

18. The award of the contract by the court implied a finding of present responsibility for that contract, since such a finding is a prerequisite for the award of any contract. DAR 1–904. This finding of present responsibility did not, however, resolve the underlying question of the debarment proceeding. First, since the issuance of the December 10, 1981 notice basing debarment on the conviction in *Bertucci,* Kiewit, Inc. had been indicted or convicted in two other proceedings. Each of these could have formed the basis for debarment. In addition, a finding of present responsibility for performance of a particular contract does not preclude a contemporaneous finding that a contractor

## II. ANALYSIS

Unless exceptional circumstances are present, judicial review can only take place once administrative action is final and all administrative remedies have been exhausted. In voiding the ongoing administrative proceeding, the district court interrupted a process in which neither exhaustion nor finality requirements had been met. Kiewit contends that congressional interference created an exceptional situation and thus compelled this circumvention of the twin requirements of exhaustion and finality. We disagree.

### A. *Exhaustion*

It is a "long settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.,* 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938) (Brandeis, J.). *See McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969). The Army's notice of proposed debarment informed Kiewit of the availability of an administrative remedy: an opportunity to "present information in opposition to this proposed debarment in person, in writing or through representation."[19] In petitioning the court

should be debarred. The findings of present responsibility are made by Corps contracting officials for individual projects. This is a practical, not a legal determination, based primarily on the contractor's suitability for a particular job. By contrast, debarment decisions are made by legal personnel and bind the entire Department of Defense. DAR 1–604.3. The Assistant Judge Advocate General for Civil Law is expected not to consider technical competence for particular projects, but rather to weigh carefully a broad array of evidence bearing upon the integrity of the contractor. Clearly, differences in focus, criteria, scope, and decisionmaking personnel make the present responsibility and debarment decisions entirely independent of each other. Hence, the district court's implicit finding of present responsibility in no way affected the debarment determination.

19. J.A. 389.

to resolve the debarment issue, Kiewit bypassed an administrative proceeding capable of granting the desired relief. Had Kiewit exhausted its administrative remedies, judicial review might well have proven unnecessary.[20]

▇▇ The exhaustion requirement seems particularly applicable in the instant case. It is premised on a recognition that "agency decisions are frequently of a discretionary nature or frequently require expertise,"[21] and, consequently, "the agency should be given the first chance to exercise that discretion or apply that expertise."[22] The debarment regulations state explicitly that the "decision to debar is discretionary"[23] and requires an evaluation of what best "protect[s] the interest of the Government."[24] This initial determination of what constitutes sound business practice for the United States Department of Defense requires the "discretion" and "expertise" of an administrator. A court is poorly suited to make such a decision.

### B. *Finality*

▇▇ In voiding the ongoing debarment proceeding, the district court acted in the absence of any final action ripe for judicial review. As this court recently held, "ripeness is imposed to assure that the issues are 'fit for judicial resolution,' *i.e.,* the questions are essentially legal rather than factual in nature, and the challenged agency action is *sufficiently final* to assure that a real controversy exists."[25]

▇▇ In the instant case, the question of debarment required a discretionary sifting of facts, rather than application of law. In addition, no final binding decision on debarment had been made. The proposed debarment notice merely served to initiate proceedings to consider whether debarment should be ordered. The Supreme Court recently held in *FTC v. Standard Oil Co. of Cal.*[26] that an order "[s]erving only to initiate the proceedings ... has no legal force,"[27] "is not a definitive statement of position,"[28] and is not " 'final agency action' "[29] ripe for review. The proposed debarment order in this case falls squarely within the range of interim actions held not ripe for review in *Standard Oil.*

▇▇ Kiewit contends that the district court had ruled "upon *final agency action* —the de facto debarment."[30] The de facto debarment was indeed final agency action. Kiewit, however, confuses the de facto debarment—the illegal suspension without notice from August 19 to December 10—with actual debarment—an official order issued after notice and hearing. The de facto debarment could be and was reviewed by the district court. It was the basis for the award of the contract. But this illegal suspension, although final action, could not form the basis for the dissolution of the interim action, the ongoing debarment proceeding.

### C. *The Allegations of Congressional Interference*

▇▇ Exhaustion and finality requirements may be waived in "only the most

20.  *See McKart v. United States,* 395 U.S. 185, 195, 89 S.Ct. 1657, 1663, 23 L.Ed.2d 194 (1969).

21.  *McKart v. United States,* 395 U.S. 185, 194, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969). *See League of United Latin American Citizens v. Hampton,* 501 F.2d 843, 847 (D.C.Cir.1974); *Sterling Drug, Inc. v. FTC,* 450 F.2d 698, 710 (D.C.Cir.1971).

22.  395 U.S. at 194, 89 S.Ct. at 1662.

23.  DAR 1–604.1(i).

24.  DAR 1–604.

25.  *Gulf Oil Corp. v. Department of Energy,* 663 F.2d 296, 310 (D.C.Cir.1981) (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967) (footnote omitted).

26.  449 U.S. 232, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980).

27.  *Id.* at 242, 101 S.Ct. at 494.

28.  *Id.* at 241, 101 S.Ct. at 493.

29.  *Id.* at 243, 101 S.Ct. at 494.

30.  Appellee's Brief at 47.

exceptional circumstances."[31] As this court has held, "allegations of agency bias or prejudgment based on ex parte communications are insufficient for injunctive relief and cannot be reviewed until the agency has made an adverse determination and an appeal has been taken raising these claims on the record as a whole."[32] Finality and exhaustion requirements may be dispensed with only "where the agency has very clearly violated an important constitutional or statutory right."[33]

▮ The district court held, and Kiewit now argues, that congressional interference so tainted the administrative process that Kiewit's rights were clearly and significantly violated. They rely primarily on two cases: *D.C. Federation of Civic Associations v. Volpe*,[34] the controlling case in this circuit, and *Pillsbury Co. v. FTC*.[35] Under the standards announced in these cases, Kiewit has failed to demonstrate clear interference with its due process rights.[36] Therefore we need not decide whether the district court's resolution of the administrative issue was a proper remedy for the alleged congressional interference,[37] or whether the court's decision on the merits of debarment was correct.

In *D.C. Federation*, the Secretary of Transportation approved construction of a bridge across the Potomac River in part because of threats by the subcommittee chairman to withhold mass transit funding unless the bridge was approved. This court held that it was impermissible for the Secretary to consider these congressional threats in arriving at his decision. Since the Secretary's action in that case was not judicial or quasi-judicial, the court noted that the test for improper interference was whether the congressional action *actually* affected the decision.[38] The court indicated that if the decision had been judicial or quasi-judicial, it could be invalidated by "the appearance of bias or pressure."[39] Under this standard, pressure on the decisionmaker alone, without proof of effect on the outcome, is sufficient to vacate a decision.

▮ In either context, the proper focus is not on the content of congressional communications in the abstract, but rather upon the relation between the communications and the adjudicator's decisionmaking

---

**31.** 4 K. DAVIS, ADMINISTRATIVE LAW TREATISE § 26:10 at 460 (1983).

**32.** *Touche Ross & Co. v. SEC,* 609 F.2d 570, 575 (2d Cir.1979) (citing *R.A. Holman & Co. v. SEC,* 299 F.2d 127, 129 (D.C.Cir.), *cert. denied,* 370 U.S. 911, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962); *National Lawyers Guild v. Brownell,* 225 F.2d 552, 555 (D.C.Cir.1955), *cert. denied,* 351 U.S. 927, 76 S.Ct. 778, 100 L.Ed. 1457 (1956)). *See First Jersey Securities, Inc. v. Bergen,* 605 F.2d 690, 699 (3d Cir.1979), *cert. denied sub nom. First Jersey Securities, Inc. v. Biunno,* 444 U.S. 1074, 100 S.Ct. 1020, 62 L.Ed.2d 756 (1980); *Associated Press v. FCC,* 448 F.2d 1095, 1106–07 (D.C.Cir.1971).

**33.** *Sterling Drug, Inc. v. FTC,* 450 F.2d 698, 710 (D.C.Cir.1971). *See Association of Nat'l Advertisers, Inc. v. FTC,* 627 F.2d 1151, 1156 (D.C. Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1113 (1980); *id.* at 1177–78 (Leventhal, J., concurring); *Thermal Ecology Must Be Preserved v. Atomic Energy Comm'n,* 433 F.2d 524, 526 (D.C.Cir.1970).

**34.** 459 F.2d 1231 (D.C.Cir.1971), *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972).

**35.** 354 F.2d 952 (5th Cir.1966).

**36.** To void an administrative proceeding, the congressional interference must be clear on the record. The record before us is necessarily incomplete; congressional interference with the debarment proceeding was never at issue until after the hearing on the merits. Our finding of no clear evidence of interference, however, does not preclude a finding of interference in a timely appeal of final administrative action. We hold only that in the present posture of this case, sufficient evidence has not been adduced of interference with the decisionmaker to rebut the strong presumption that exhaustion and finality requirements should operate.

**37.** In both of these cases, the court vacated and remanded to the agency for a new decision. Since we do not find clear evidence that the process was tainted, we do not need to consider who might be an appropriate decisionmaker when agency procedures have been compromised.

**38.** *See* 459 F.2d at 1246.

**39.** *Id.*

process. A court must consider the decisionmaker's input, not the legislator's output. The test is whether "extraneous factors intruded into the *calculus of consideration*" of the individual decisionmaker.[40]

*Pillsbury* invalidated a Federal Trade Commission order after a Senator questioned the Commission Chairman and other Commissioners [41] repeatedly about their decision in a pending case and criticized them for misapplying the antitrust laws in the case. The court held that "[t]o subject an administrator to a searching examination as to how and why he reached his decision in a case still pending before him, and to criticize him for reaching the 'wrong' decision ... sacrifices the appearance of impartiality—the *sine qua non* of American *judicial* justice." [42]

*Pillsbury* also emphasized the effect of communications on the "decisional process" [43] of the adjudicators. The court considered the effect of the congressional investigation "upon the *mental decisional processes* [44] of a commission *in a case which is pending before it.*" [45] It noted that "the appearance of impartiality ... cannot be maintained unless *those who exercise the judicial function* are free from powerful external influence." [46] Pressure must be

evaluated in the context of a concrete decision process.[47]

In applying these principles to the instant case, we see nothing in the record to support a finding of actual or apparent congressional interference.[48] No evidence suggests that Brigadier General Holdaway, the ultimate decisionmaker, was influenced by or even aware of Senator Levin's communications. It was never shown that Senator Levin contacted Brigadier General Holdaway directly. Nor was it established that the Department of Defense officials who did communicate with Levin actually contacted Brigadier General Holdaway. Hence, on the record before us, we have no basis for concluding that the responsible official's "calculus of consideration" or "mental decisional processes" were clearly tainted by congressional pressure. In the absence of such a showing, we must conclude that there was no clear violation of Kiewit's due process rights to justify the district court's extraordinary interruption of the administrative process.

## CONCLUSION

Congressional oversight serves as a vital control on the quality and propriety of low visibility executive decisionmaking.[49] We are mindful, however, that zealous over-

40. *Id.* (emphasis supplied).

41. During the hearing, Chairman Howrey disqualified himself from further consideration of the *Pillsbury* case, 354 F.2d at 961. In addition, "of the four commissioners who actually participated in the final 1960 *Pillsbury* decision, two (Commissioners Secrest and Kintner) were substantially exposed to whatever 'interference' was embodied in the hearings, and one (Commissioner Keris) was at least indirectly 'affected' by reason of his FTC status in 1955 as Secrest's assistant." *Id.* at 956.

42. *Id.* at 964.

43. *Id.* at 954.

44. *Id.* at 964 (emphasis supplied).

45. *Id.*

46. *Id.* (emphasis supplied).

47. *Pillsbury's* focus on the mental processes of the adjudicating official was noted by this court in *Koniag Inc., Village of Uyak v. Andrus,* 580

F.2d 601 (D.C.Cir.), *cert. denied,* 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 713 (1978). In distinguishing *Pillsbury,* the court stated, "Nevertheless, we think the *Pillsbury* decision is not controlling here because none of the persons called before the subcommittee was a decisionmaker in these cases." *Id.* at 610. The court further noted, "The worst case that can be put upon the hearings is that [a close adviser to the administrator] was present when the subcommittee expressed its belief that certain villages had made fraudulent claims and that the [administrator's] decisions were in error. This is not enough." *Id.*

48. *See supra* note 36.

49. *See Watkins v. United States,* 354 U.S. 178, 187, 77 S.Ct. 1173, 1179, 1 L.Ed.2d 1273 (1957) (Warren, C.J.) ("The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad .... *It comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste.*") (emphasis supplied). *See* Ribicoff, *Congressional Oversight and Regulatory Reform,* 28 Ad.L.Rev. 415 (1976).

sight can intrude on the rights of disputants in an administrative adjudication. The stringent standards of *D.C. Federation* and *Pillsbury* protect against congressional infringement of these due process standards by requiring insulation of the decisionmaking process from congressional pressure.

In this case the congressional communications at issue were never shown clearly to have intruded into the debarment decisionmaking process. The district court's interruption of the administrative process before remedies were exhausted and in the absence of final action was therefore unwarranted. The administrative debarment hearing must be permitted to proceed. Accordingly, this case is reversed and remanded to the district court with instructions to remand the matter of Kiewit and Kiewit, Inc.'s proposed debarments to the Department of the Army. We offer no opinion on the merits of the proposed debarment, or on Kiewit's entitlement to relief in the event that a determination is made (either at the administrative level or pursuant to subsequent judicial review) that there is no adequate justification for a debarment. We simply hold that the district court erred in blocking the administrative debarment hearing.[50]

*So ordered.*