ATX, INC., Petitioner,

v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION, Respondent.

International Association of Machinists
and Aerospace Workers, et al.,
Intervenors.

No. 94–1302.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 9, 1994.

Decided Dec. 16, 1994.

Philip Allen Lacovara, Washington, DC, argued the cause for the petitioner. On brief were John J. Sullivan, Robert M. Beckman and David M. Kirstein, Washington, DC.

Thomas L. Ray, Atty., Dept. of Transp., Washington, DC, argued the cause for respondent. On brief were Paul M. Geier, Asst. Gen. Counsel, and Dale C. Andrews, Deputy Asst. Gen. Counsel, Dept. of Transp., and Anne K. Bingaman, Asst. Atty. Gen., and John J. Powers, III, Robert B. Nicholson and James Lowe, Attys., Dept. of Justice, Washington, DC.

On brief for the intervenors were Joseph Guerrieri, Jr., Robert S. Clayman, Gary Green, R. Russell Bailey, Jerry Anker and Clay Warner, Washington, DC.

Before WALD, WILLIAMS and HENDERSON, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

ATX, Inc. (ATX) petitions for review of a Department of Transportation (Department or DOT) order denying its application to operate a new airline in Boston, Atlanta and Baltimore/Washington. The Department found ATX unfit in light of evidence manifesting a number of regulatory deficiencies at

airlines previously controlled by its founder, Frank Lorenzo. ATX claims that members of the United States Congress hostile to Lorenzo improperly interfered with the proceeding and that DOT unreasonably focused on defects in the records of airlines controlled by Lorenzo even though it had earlier found those airlines fit to operate. Although some of the congressional opposition causes concern, we conclude that it did not fatally flaw the proceeding. Because we also believe that the Department reasonably found ATX unfit, we deny the petition.

## I. BACKGROUND

In April 1991, Frank Lorenzo founded a new airline, which was originally known as Friendship Airlines and later changed its name to ATX.[1] He initially controlled 73 per cent of the company's voting stock and served as one of three members of its board of directors. Lorenzo had previously served as chairman of the board of directors of Texas Air Corporation (TAC). Under his leadership, TAC acquired several airlines, including Eastern, Continental, New York Air and Texas International. A number of employees of those airlines joined Lorenzo at ATX in key management positions. They planned for the new venture to provide service between major cities in the eastern United States.

Congressional opposition to ATX arose even before the company had filed an application to operate an airline, based largely on Lorenzo's management of Eastern Air Lines. Several members of Congress wrote to DOT Secretary Federico Peña (Secretary Peña or Peña) to urge him to deny the anticipated ATX application.[2] The first of the letters, dated February 17, 1993, is typical:

We are deeply concerned about reports that Frank Lorenzo, the former chairman of Texas Air Corporation, may soon be seeking federal approval to establish another carrier in the domestic airline industry. We strongly urge you to reject his application for a certificate of public convenience and necessity.

As you're aware, Title IV, Sec. 401 of the Federal Aviation Act authorizes the Department of Transportation to ensure that all new carriers are "... fit, willing, and able" before issuing a certificate of public convenience and necessity....

We believe a rigorous application of the Section 401 standard would find that Frank Lorenzo is not "fit" to own and operate another airline. Under his management, the now-defunct Eastern Airlines was fined and reprimanded by the Federal Aviation Administration for concealing federal safety violations and approving aircraft for service when they were not airworthy. It was not uncommon for consumers to bear the risk of Mr. Lorenzo's actions. As the former Mayor of Denver, you may recall that one such bankruptcy left thousands of passengers stranded at airports when business operations were abruptly ceased.

Given his previous management record, we respectfully urge you to reject Frank Lorenzo's application for a certificate of public convenience and necessity.

Joint Appendix (JA) 35.

Twenty-one members of the U.S. House of Representatives signed the letter. Most were members of the House Committee on Public Works and Transportation (Committee), which oversees DOT and reviews airline legislation. Rules of the House of Representatives, H.R.Doc. No. 256, 101st Cong.2d Sess. 390 (1991) (Rule X, cl. 1(p)(10)). The signers included the chairman of the full Committee, the chairman of the Aviation Subcommittee, and the chairman of the Investigations and Oversight Subcommittee.

---

1. To avoid confusion, we refer to the petitioner as ATX throughout our opinion. The company amended its certificate application to reflect the name change on May 28, 1993.

2. ATX alleges that airline employees' labor unions orchestrated the congressional letter writing campaign, motivated by lingering hostility to Lorenzo over past labor disputes at Eastern.

The Air Line Pilots Association (ALPA) and the International Association of Machinists and Aerospace Workers (IAM) are intervenors here and do not dispute their involvement in the letter writing campaign. At least one congressman expressly noted that he had provided a copy of his letter to the ALPA's legislative representative. JA 44.

ATX filed its petition on March 29, 1993. At least 125 House and Senate members eventually wrote to Secretary Peña either jointly or individually to declare their opposition to Lorenzo. Additional congressional correspondence forwarded constituent letters about the ATX application (predominantly negative) to Secretary Peña without comment. Two congressmen (both of whom had signed the first letter) introduced legislation designed to prevent Lorenzo from reentering the airline industry. H.R. 943, 103d Cong., 1st Sess., 139 Cong.Rec. H659 (Feb. 17, 1993) (Rep. M. Collins); H.R. 3641, 103d Cong., 1st Sess., 139 Cong.Rec. H4681 (July 14, 1993) (Rep. Rahall).

The Secretary responded to the congressional correspondence with a form letter. "I want to assure you that the Department will examine Friendship Airlines' application thoroughly under the fitness requirements that we impose on all prospective airlines," he wrote. JA 66. "Since Friendship Airlines' application is currently under review, I hope that you will understand that it would be inappropriate for me to discuss the merits of the case with you." *Id.* He stated that he planned to place the letters in the file for "contacts outside the record of the case." *Id.*

The Department set the matter for formal evidentiary hearing before an administrative law judge (ALJ) pursuant to 14 C.F.R. § 302.1750. *Application of Friendship Airlines, Inc.,* Order 93–4–50 (Dep't Transp. Apr. 29, 1993).[3] Peña personally made the decision to do so although Acting Assistant Secretary for Policy and International Affairs Patrick Murphy signed the order.[4] Murphy had recommended the hearing op-

tion to Peña by memorandum, noting that there had been "substantial negative public reaction to the prospect of Mr. Lorenzo's involvement in a new airline," including the congressional comments and the proposed legislation. JA 716–17. Murphy believed that a hearing would provide "maximum possible due process to interested parties" and that the initial decision "would be more insulated from political or other pressures." JA 719.

The order required the ALJ to take evidence and issue an initial decision to be reviewed by the Department. His inquiry was to focus on the three factors the Department considers in certifying an airline: financial fitness, managerial competence and disposition to comply with regulatory requirements.[5] The proceedings began with four days of testimony presented by ATX, after which intervenors Air Line Pilots Association (ALPA) and International Association of Machinists and Aerospace Workers (IAM) moved to dismiss the application. In an Initial Decision dated September 8, 1993 the ALJ found that ATX lacked proper compliance disposition largely because it had failed to comply with orders issued during the proceeding. The ALJ granted the intervenors' motion and recommended that ATX's petition be denied.[6]

The Department vacated the ALJ's decision and ordered that the evidentiary hearing continue, concluding that "the public interest requires that our decision here should be based on a more completely developed record." *ATX, Inc. Fitness Investigation,* Order 93–10–18 (Dep't Transp. Oct. 7, 1993) at

---

**3.** We previously dismissed an ATX petition for review of the decision to hold a formal evidentiary hearing. *ATX, Inc. v. Department of Transp.,* No. 93–1369, 1993 WL 280353 (D.C.Cir. July 14, 1993).

**4.** During an internal DOT inquiry into allegations of improper congressional influence in the ATX proceeding, Secretary Peña told investigators that he had made the decision to set the matter for hearing. Office of Inspector General, U.S. Dep't of Transp., Investigation 41R005I001 (Supplemental) (1994) at 15–17 (letter filing). The order itself made no reference to his participation.

**5.** The Department considers these factors pursuant to the statutory mandate that it issue an airline certificate only to those applicants found "fit, willing, and able to perform such transportation properly and to conform to the provisions of [the Federal Aviation] Act and the rules, regulations, and requirements ... hereunder." 49 U.S.C. § 1371(d)(1).

**6.** We previously dismissed an ATX petition to review the Initial Decision. *ATX, Inc. v. Department of Transp.,* No. 94–1071, 1994 WL 606076 (D.C.Cir. May 4, 1994).

2.[7] Seven additional days of hearings followed. The ALPA and the IAM presented five days of testimony against ATX, primarily involving financial problems and safety incidents at Eastern and Continental while those airlines were controlled by TAC and Lorenzo. ATX spent two days in rebuttal.

Congressional opposition recurred during the hearing when the ALJ allowed Congressman Michael "Mac" Collins to testify pursuant to 14 C.F.R. § 302.14. That rule allows "any person" to participate in a DOT hearing. Collins, who signed the first letter and introduced one of the Lorenzo-related bills in the House, urged the ALJ to deny the petition on behalf of his constituents affected by the bankruptcy of Eastern. He restated the findings of the court-appointed examiner that Lorenzo had mismanaged the airline. The ALJ allowed the testimony over ATX's objection that it did no more than summarize the examiner's report, which had already been placed into evidence. The judge explained "I think that the Department and the decision maker in this case would be interested in the views of a Congressman." JA 331.

On December 22, 1993, the ALJ issued a second Initial Decision. In addition to renewing his finding that ATX lacked proper compliance disposition, the judge determined on the basis of evidence adduced during the second hearing that the intended managers lacked sufficient managerial and technical competence to secure certification. He recommended again that ATX's application be denied. Shortly afterward (in January 1994), ATX filed a supplement to its application listing new investors in the venture and a reduction in Lorenzo's ownership share of the company.

The Department considered the record *de novo* and issued a final order denying ATX's application on April 5, 1994. *ATX, Inc. Fitness Investigation,* Order 94–4–8 (Dep't Transp. Apr. 5, 1994) (*ATX Order*). Acting Assistant Secretary Murphy first found that the history of the TAC airlines was relevant to the ATX petition because Lorenzo had effectively controlled airlines held by TAC and would significantly influence ATX.

Based on extensive evidence of recurring safety problems and management deficiencies at Eastern and Continental as developed by the ALJ in the second Initial Decision, Murphy concluded in a 75–page order that ATX lacked both managerial competence to operate an airline and a disposition to comply with regulatory requirements. Thus, ATX was not "fit" for a certificate under 49 U.S.C. § 1371(d)(1).

We will not restate the lengthy history set out in the ATX order. We note, however, that the record contained evidence of serious recurring problems, most related to safety, at Eastern and (to a lesser extent) at Continental. The Federal Aviation Administration (FAA) was repeatedly involved in resolving safety questions at Eastern from 1987 through 1990. It conducted special surveillance and investigations of the airline throughout that period, issued civil penalty letters and, in April 1989, revoked Eastern's authority to handle maintenance and repairs at New York City's Kennedy Airport. The Department emphasized that the FAA had never before taken that action against a major United States airline. In addition, Joseph Corr, former chief executive officer and chairman of the board of directors of Continental, testified that Continental had managed its maintenance programs poorly and that Lorenzo had been less than vigilant in safety matters. The ALJ expressly found Corr a credible witness and concluded that "his testimony was very unfavorable to Mr. Lorenzo, particularly with respect to safety." JA 558.

ATX makes two arguments in its petition for review. First, it contends that congressional interference in the proceeding, and the resultant political pressure placed on DOT to deny the application, denied it due process. Second, ATX asserts that the Department's emphasis on Lorenzo and the prior history of the TAC airlines was arbitrary, particularly in light of earlier DOT determinations that Eastern had maintained its fitness as an air carrier.

---

**7.** We denied a petition challenging parts of the interlocutory order. *ATX, Inc. v. Department of Transp.,* No. 93–1717, 1993 WL 518461 (D.C.Cir. Nov. 30, 1993).

## II. DISCUSSION

### A. *Congressional Interference*

 An administrative adjudication is "invalid if based in whole or in part on [congressional] pressures." *District of Columbia Fed'n of Civic Ass'ns v. Volpe,* 459 F.2d 1231, 1246 (D.C.Cir.), *cert. denied,* 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972) *(Volpe).* Congressional interference so tainting the administrative process violates the right of a party to due process of law. *Id.* at 1245–49; *Pillsbury Co. v. Federal Trade Comm'n,* 354 F.2d 952, 963–65 (5th Cir.1966) *(Pillsbury).* "A court must consider the decisionmaker's input, not the legislator's output. The test is whether 'extraneous factors intruded into the *calculus of consideration*' of the individual decisionmaker." *Peter Kiewit Sons' Co. v. United States Army Corps of Eng'rs,* 714 F.2d 163, 170 (D.C.Cir.1983) (quoting *Volpe,* 459 F.2d at 1246) (emphasis added) *(Kiewit).* Applying this test, we conclude that the congressional input neither created an appearance of impropriety nor actually affected the outcome.

Congressional involvement in the ATX adjudication is substantial enough to warrant close examination. The record establishes that members of Congress repeatedly contacted Secretary Peña to voice their opposition to the ATX application for certification. Peña received at least 60 letters commenting negatively on Lorenzo, almost all concluding that he was not fit to return to the airline industry and urging the Secretary to deny ATX's petition outright. One congressman expressed his view that "Mr. Lorenzo embod-

ies all that is wrong with the 1980's corporate culture in America." JA 48.

The source of the opposition is as notable as its size. The chairman of the House committee with responsibility for aviation and the chairmen of two of its subcommittees participated, as did the House Majority Whip. JA 113. One member of Congress testified during the hearing before the ALJ, which is particularly troubling. Legislators thus vigorously conveyed their interest throughout the proceeding.[8]

 Congressional interference in the administrative process is of heightened concern in a quasi-judicial proceeding, which is guided by two principles. First, "the *appearance* of bias or pressure may be no less objectionable than the reality." *Volpe,* 459 F.2d at 1246–47 (emphasis added); *see also Koniag, Inc. v. Andrus,* 580 F.2d 601, 610 (D.C.Cir.), *cert. denied,* 439 U.S. 1052, 99 S.Ct. 733, 58 L.Ed.2d 712 (1978) *(Koniag)* (congressional letter "compromised the appearance of the Secretary's impartiality"). Second, judicial evaluation of the pressure must focus on the *nexus* between the pressure and the actual decision maker. As we have previously observed, "the proper focus is not on the content of congressional communications in the abstract, but rather upon the relation between the communications and the adjudicator's decisionmaking process." *Kiewit,* 714 F.2d at 169–70.[9]

Because the Department's regulations expressly characterize certificate proceedings as quasi-judicial, 14 C.F.R. § 300.1,[10] we

---

8. The campaign against Lorenzo prompted another congressman to write in support of ATX just prior to DOT's final decision, indicating "I am very concerned about outside pressures which should not be taken into consideration when considering an application." JA 68–69.

9. In *Kiewit* congressional inquiries occurred during an Army debarment proceeding. Kiewit, a construction company, had been convicted of bid rigging and the Deputy Secretary of Defense was asked at a Senate hearing whether and why the Army Corps of Engineers continued to do business with the company or its codefendants. After the Corps initiated debarment proceedings against Kiewit, one senator wrote to the Secretary of the Army to suggest that Kiewit's further participation in government contracts could jeopardize the integrity of the procurement pro-

cess. Kiewit challenged the debarment action, contending that it had been improperly influenced by the congressional contact. 714 F.2d at 164–67. The court concluded that the senator had not influenced the proceeding because the decision maker was not aware of his interest and had not been contacted directly. *Id.* at 170–71.

10. Section 300.1 provides: "Under the transfer of authority [from the Civil Aeronautics Board] under section 1601(b)(1) of the Federal Aviation Act of 1958, certain of DOT's functions are similar to those of a court...." Congress did not originally transfer authority for domestic airline certification to the Department under Section 1601(b)(1). *See* Pub.L. No. 95–504, § 40, 92 Stat. 1705, 1744 (1978). In 1984, however, it amended that section to transfer to DOT all au-

must determine whether congressional interference occurred, or appeared to, to such an extent as to compromise the administrative process. In the nonjudicial context, we have suggested that the way to cure the appearance of bias may be to establish "a full scale administrative record which might dispel any doubts about the true nature of [the agency's] action." *Volpe,* 459 F.2d at 1249. With respect to the nexus requirement, we have never questioned the authority of congressional representatives to exert pressure, *see id.,* and we have held that congressional actions not targeted directly at the decision makers—such as contemporaneous hearings—do not invalidate an agency decision. *See Koniag,* 580 F.2d at 610. Under this framework, it is apparent that none of the congressional pressure challenged by ATX is sufficient to invalidate the adjudication.

■ First, the two bills introduced in the House of Representatives intended to prohibit Lorenzo from reentering the airline business are squarely within *Koniag*'s conclusion that contemporaneous congressional proceedings do not invalidate an agency adjudication where the proceedings have no link to agency decision makers. *See Koniag,* 580 F.2d at 610.

■ Second, although there is evidence to suggest that the congressional letters influenced Secretary Peña's decision to set the ATX application for hearing, JA 716–17, that "influence" is not the improper influence we are concerned about. We are concerned when congressional influence shapes the agency's determination of the merits.[11] *See Volpe,* 459 F.2d at 1246 (administrative decision must be based "strictly on the merits and completely without regard to any considerations not made relevant by Congress in the applicable statutes"). Here, we have no reason to doubt that the decision to hold a hearing was made to ensure the fairness and impartiality of the process, as evidenced by Assistant Secretary Murphy's statement that a hearing would provide "maximum possible due process to interested parties." JA 719. Congressional influence on the decision to hold a hearing is unobjectionable; if anything, the decision was an appropriate response to the pressure. Although Assistant Secretary Murphy, who acted as the final decision maker, was also aware of the letters, *see* JA 716–17, the record indicates that he insulated his own decisionmaking process from congressional interference. Murphy issued a lengthy opinion based on the administrative record, the basis of his decision was clear and open to scrutiny and his decision was fully supported by the record.[12] There

thority previously held by the Civil Aeronautics Board not otherwise terminated or specifically addressed. Pub.L. No. 98–443, § 3(e), 98 Stat. 1703, 1704 (1984) (codified at 49 U.S.C. § 1551(b)(1)(E)). Domestic airline certification had not been addressed (or terminated) and thus comes within Section 1601(b)(1) as amended.

11. We also note that there is no merit to ATX's assertion that the Secretary had no authority to make the hearing decision inasmuch as he is expressly authorized to do so whenever he "believes a decision involves important questions of national transportation policy." 14 C.F.R. § 302.22a(e). The hearing decision recites that concerns about ATX raised "serious aviation policy issues bearing directly on the public interest." JA 162.

12. The record of TAC-controlled airlines recounted and relied upon by DOT is replete with incidents that reasonably led the Department to find ATX unfit. Although Eastern had a history of maintenance and quality control problems before Lorenzo and TAC assumed control of the airline in November 1986, Eastern management under Lorenzo failed to correct them. *ATX Order at 15.*

The Department concluded "[t]he failure of Mr. Lorenzo's management to address these serious safety concerns adequately constitutes a primary basis for our finding that he lacks sufficient managerial skills and compliance disposition to ensure safe operations at ATX." *Id.* at 16.

As early as June 1987 (seven months after TAC acquired Eastern) the FAA warned the airline that it was "placing departure schedules ahead of following proper maintenance procedures." *See id.* at 17. Nonetheless, safety problems too numerous to recount fully here continued to occur. For example, a Department of Defense (DOD) survey in March 1988 conducted to evaluate Eastern's ability to transport military personnel found "performance deficiencies which, if not corrected, could affect the safety of the half million DOD personnel who annually fly on Eastern aircraft." *See id.* at 19. A former Eastern pilot testified at the ATX hearing that Eastern management, while under Lorenzo's stewardship, had pressured him to fly airplanes he had determined not to be airworthy and had relieved him from assignment after he refused to fly one such aircraft. *See id.* at 26. Continental had similar although somewhat less severe maintenance and safety problems. *See id.* at 36–46.

is no reason for us to *infer* that the letters influenced his decision inasmuch as he did not reverse the ALJ's recommendations nor was the merits decision a close one on the record. If the decision maker were suddenly to reverse course or reach a weakly-supported determination, by contrast, we might infer that pressure did influence the final decision.

 Third, the congressman's testimony is squarely within the area of concern—the nexus between the pressure and the decision maker could not be more direct. Indeed, the testimony highlights a fundamental tension in the Department's regulations. On the one hand, they contemplate that an airline certification hearing is to be conducted as a quasi-judicial proceeding. On the other hand, the regulations expressly permit "any person" to participate in the hearing.[13] There is a strong potential for an appearance of impropriety in allowing congressional opinion testimony in a quasi-judicial proceeding and we caution that "any person" must be one with a legitimate interest. Unlike the ALJ, we do not believe that the decision maker should be "interested in the views of a Congressman" without more.[14] Nevertheless, the testimony here falls short of creating a fatal appearance of bias as it was based almost entirely on information already available to the ALJ, was void of threats and was not relied on in any of the decisions, which were accompanied by extensive findings and reasons. In context, the omission of any reference to the testimony seems to represent a recognition that it was, in the end, irrelevant.

Our conclusion is consistent with the leading precedent. In *Pillsbury*, the Fifth Circuit determined that congressional pressure "sacrifices the appearance of impartiality" and violates due process when it provides "powerful external influences" on the decisionmaking process of an official exercising a judicial function. 354 F.2d at 964; *see also Kiewit*, 714 F.2d at 170. *Pillsbury* found an impermissible influence stemming from a congressional hearing during which the Chairman of the Federal Trade Commission was subjected to "a searching examination as to how and why he reached his decision in a case still pending before him, and [criticizing] him for reaching the 'wrong' decision." 354 F.2d at 964. Here, the congressional letters and testimony were neither searching nor critical of an actual or potentially "wrong" decision; indeed they were superfluous in view of the record which, if ever a record can, speaks for itself.

In addition we find no evidence that the legislative activity *actually* affected the outcome on the merits. *See Kiewit*, 714 F.2d at 169; *Volpe*, 459 F.2d at 1246. Neither the Department's final decision nor the ALJ's two decisions mentioned the testimony of the congressman, the congressional letters or the proposed legislation. All of the congressional contacts were placed in the administrative record and ATX responded to them. JA 803. Finally, the record manifests that both the Secretary and his acting Assistant Secretary were non-committal in their reactions to the congressional contacts. Secretary Peña's response to the correspondence stressed that it was inappropriate for him to discuss the merits of the case with the congressmen. JA 66. *See also* Office of Inspector General, U.S. Dep't of Transp., Investigation 41R005I001 (Supplemental) (1994) at 18 (letter filing) ("[T]he Secretary said he would have given the standard response that the matter was before an ALJ.").

13. "Any person, including any State, subdivision thereof, State aviation commission, or other public body, may appear at any hearing, other than in an enforcement proceeding, and present any evidence which is relevant to the issues." 14 C.F.R. § 302.14(b).

14. We have previously observed that determining the parties entitled to participate in agency proceedings "resists precise legislative or judicial delineation, and requires close scrutiny, in the context of the statutory and regulatory schemes governing the proceedings in which intervention is sought, of the private interest asserted." *Nichols v. Asbestos Workers Local 24 Pension Plan*, 835 F.2d 881, 896 n. 108 (D.C.Cir.1987) (citations omitted). DOT's regulation governing participation in airline certification proceedings expressly recognizes that a party seeking to appear can present evidence only if it is "relevant to the issues." 14 C.F.R. § 302.14(b). Strict adherence to this standard should preclude irrelevant, and therefore improper, congressional participation.

We caution that we do not mean that congressional pressure will never compromise the proceeding so long as the record would allow the decision maker to reach the same conclusion independently. We have held that an administrative decision must be based "strictly on the merits and completely without regard to any considerations not made relevant by Congress in the applicable statutes." *Volpe,* 459 F.2d at 1246. Here, however, the nexus between the pressure exerted and the actual decision makers is so tenuous and the evidence so adequately establishes ATX's ineligibility for an airline certificate that we conclude political influence did not enter the decision maker's "calculus of consideration."

### B. *The TAC Record*

ATX also argues that the Department's denial of its application for a certificate was arbitrary and capricious in that the Department (1) improperly focused on past problems at TAC airlines when it had repeatedly found those airlines fit to continue to operate; (2) unreasonably focused on Lorenzo; and (3) irrationally failed to consider the difference between the modest operation proposed by ATX and the larger scale operations at Eastern and Continental. We conclude that the Department did not act inconsistently with its past decisions and that it adequately explained its decision to deny ATX's application.

Under the judicial review provision of the Administrative Procedure Act, we examine the merits of the Department's decision to determine whether it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). ATX first maintains that the Department irrationally failed to follow its previous determinations that Eastern, Continental and other Lorenzo-controlled airlines were fit to operate under the standards used to evaluate the ATX application. It points specifically to the Department's December 1988 order declining to initiate a fitness investigation of Eastern, issued in the midst of the regulatory incidents negatively cited in the ATX order. *Petition of Air Line Pilots Ass'n, Int'l to Institute a Continuing Fitness Investigation of Eastern Air Lines, Inc.,* Order 88–12–30 (Dep't Transp. Dec. 14, 1988).

ATX contends that administrative res judicata binds the Department to its 1988 order. It is true that the Department found then that "no convincing *prima facie* case of a lack of fitness with respect to Eastern has been made." *Id.* at 7. We need not address the res judicata argument, however, because the Department noted six significant post–1988 incidents sufficient to support its decision to deny the ATX certificate even assuming the 1988 order is preclusive.[15] *ATX Order* at 50–51. Although ATX disputes the probative value of the bankruptcy court's removal of Lorenzo from Eastern's management and a federal grand jury indictment naming Eastern as a defendant, we are satisfied that the

15. The Department listed six post–1988 incidents in its order. *ATX Order* at 50–51. First, the FAA issued a civil penalty letter on August 29, 1989, settling maintenance problems found in a May 1989 inspection of Eastern. Second, the FAA issued another civil penalty letter on August 29, 1989, settling airworthiness violations at Eastern occurring from October 1988 through December 1988. Third, FAA issued a civil penalty letter on August 30, 1989, settling the maintenance violations and record falsifications at Eastern's Kennedy airport facility between January 1988 and February 1989 that had led to the revocation of Eastern's maintenance and repair authority. Fourth, a federal grand jury indicted Eastern as a corporate defendant in July 1990 charging conspiracy in connection with improper maintenance and falsification of records at the Kennedy Airport facility. The company pleaded guilty on seven counts and agreed to pay a $3.5 million fine. *See id.* at 33–34. Fifth, the FAA revoked its approval of Eastern's REAP (maintenance and quality assurance) program in November 1988 and did not reinstate it until August 1989. Sixth, the U.S. bankruptcy court ordered that an outside trustee be appointed to manage Eastern in April 1990. *In re Ionosphere Clubs, Inc.,* 113 B.R. 164, 172 (Bankr.S.D.N.Y.1990).

ATX also argues that the Department's reliance on the incidents between 1988 and 1990 is barred by administrative res judicata as a result of its 1990 approval of Scandinavian Airlines' acquisition of Continental stock. *In re Acquisition of Stock in Continental Airlines Holdings, Inc., by Scandinavian Airlines Sys.,* Order 90–9–15 (Dep't Transp. Sept. 12, 1990). That order, however, considered the fitness of the Scandinavian Airlines investors and not Lorenzo, who reduced his ownership interest and resigned his positions as an officer and director of Continental incident to the transaction. *See id.* at 5.

Department provided reasonable and substantial grounds to support its determination of unfitness. In particular, we note that the FAA's unprecedented decision to revoke Eastern's authority to operate its repair facility at Kennedy Airport occurred after the December 1988 order and was one of the factors relied on by DOT.[16]

■ Furthermore we do not believe that the Department's focus on Lorenzo was improper. The Department explained at length that it focused on Lorenzo because he had founded the airline, was one of only two members of its board of directors with previous airline experience, retained a significant ownership interest in ATX even after the January 1994 reorganization and had played an active management role at Continental and Eastern. *Id.* at 10–15. There is nothing unreasonable in this explanation, which is consistent with other DOT decisions finding relevant the negative influence potential of an airline owner with a history of past compliance problems. *See Application of Ryan Air Service,* Order 88–6–6 (Dep't Transp. June 3, 1988); *Application of Tropical Airways, Inc.,* Order 91–3–17 (Dep't Transp. March 8, 1991).

■ We are also not persuaded by ATX's argument that Continental's and Eastern's operations were not correctly compared to ATX's modest proposal. Again, the Department reasonably explained its position that inattention to safety could not be differentiated based on the size of the carrier. *ATX Order* at 56. We agree, since compliance disposition depends on the individuals in control of the airline. In light of the Depart-

ment's determination that Lorenzo had acted "confrontationally and cavalierly" in managing the larger carriers, it did not act arbitrarily in concluding that he would act no differently at ATX. *Id.*

■ Finally, we address ATX's remaining issues. Its dispute with DOT regarding Stephen Berger's eligibility to serve as the chairman of ATX's board of directors is mooted by our decision on the merits. DOT's disposition of ATX's motion for confidential treatment of its private placement memorandum, however, must be resolved. ATX moved to withhold from public disclosure its placement memorandum prepared for potential investors because it contains confidential business plans. The Department refused the request, taking the position that "[a]lthough portions of it may warrant confidential treatment, it is clear that not all portions do, and the submitter of information for which confidentiality is requested has the burden of demonstrating which is which." JA 799.[17]

We believe that ATX met its burden by, in effect, segregating the memorandum from all other papers it submitted as part of its application. As the memorandum contains, in the main, ATX's financial analysis of the proposed venture, DOT's conclusion that ATX's memorandum is different from business and financial plans it has withheld from public disclosure in the past is wrong.[18] Accordingly, we remand for further proceedings consistent with this opinion and with the provisions of 14 C.F.R. § 302.39(f) so that the Department can specify the conditions under which the memorandum is to be withheld from public disclosure.

---

16. ATX contends that Lorenzo should not be held accountable for the problems at the Kennedy Airport facility because (1) the alleged conspiracy began before TAC acquired Eastern; (2) no one involved with ATX was named as a target in the resulting criminal investigation or implicated in the wrongdoing; and (3) Eastern's guilty plea came after Lorenzo had left the airline. However, the Department reasonably found that "Mr. Lorenzo's management did not have effective systems to deter or detect such activities, and did not conduct an investigation after learning of the investigation by the United States Attorney." *ATX Order* at 55.

17. The Department relied on 14 C.F.R. § 302.39, which requires that "[a]ny person who objects to

the public disclosure of any information contained in any paper filed ... shall segregate ... such information into a separate paper."

18. While the Department is correct that 14 C.F.R. § 302.39 requires the person seeking confidentiality to make a particularized showing of the portions that qualify for non-disclosure, that requirement is set forth as one of three alternatives. One of the other alternatives is the filing of a petition for review within five days of the Department's order; ATX filed a petition the next day. JA 829. More important, DOT has not pointed to anything of consequence in the memorandum that is not confidential.

For the reasons given, ATX's petition for review is denied, except insofar as it challenges the Department's denial of ATX's motion for confidential treatment of its private placement memorandum.

*So ordered.*